**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Lucille M. Aamodt, et al.** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | **Civ. A. No. 03-3925** |
| : | |
| **Unisys Corporation,** : | |
| : | |
| **Defendant** : | |
| : | |

**DEFENDANT UNISYS CORPORATION'S SEPARATE STATEMENT OF
UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.    Undisputed Facts Applicable To All Summary Judgment Plaintiffs' Claims .................. 1

    A.    Burroughs And Sperry Corporation Merged To Form Unisys Corporation .......... 1

    B.    Unisys Corporation Implements A New Unisys Flexible Benefits Program For All Unisys Employees, Contemporaneously Advising All Employees That The Company's Welfare Benefits Are Subject To Change Or Termination At Any Time ................................................................... 1

    C.    Consistent With Its Reservation Of Rights, Unisys Made Changes To The Medical Benefits It Provided To Employees Under The Unisys Medical Plan ......................................................................................... 5

    D.    Unisys Announces That After April 1, 1989 All Retirees Will Receive Retiree Medical Benefits Pursuant To The Unisys PRM Plan, And Communicates In Clear And Unambiguous Terms That It Can Change Or Terminate That Plan At Any Time .................................................... 5

    E.    After Distributing The Unisys PRM SPD, Unisys Continued To Advise Employees Of Its Right To Change Or Terminate The Unisys PRM Plan .......... 9

    F.    Unisys Employees Who Sign COBRA Forms Are Reminded That The Company Can Change Or Terminate Its Welfare Benefit Plans ........................ 10

    G.    Unisys Continued To Remind Employees Who Had Retired But Deferred Participation In The Unisys PRM Plan Of Its Right To Change Or Terminate That Plan ................................................................... 11

    H.    Unisys Annually Exercised Its Right To Make Changes To The Unisys PRM Plan ................................................................................. 13

II.    Undisputed Facts Applicable To Individual Plaintiffs' BOFD Claims ......................... 15

    A.    Frank Mahoney ......................................................................... 15

    B.    Wallace George ......................................................................... 17

    C.    Robert Barnes ........................................................................... 22

    D.    Madeline King ........................................................................... 26

    E.    Bernard Zaber ........................................................................... 30

    F.    Leonard Portzline ....................................................................... 33

    G.    Leonard Sichel ........................................................................... 37

    H.    Floyd Ross ................................................................................ 47

I.      **Undisputed Facts Applicable To All Summary Judgment Plaintiffs' Claims**

A.      **Burroughs And Sperry Corporation Merged To Form Unisys Corporation**

1.      Unisys Corporation was created in September 1986 as the result of a merger between Burroughs Corporation and Sperry Corporation.  Prior to the merger, Burroughs and Sperry provided medical benefits to their employees and retirees in accordance with certain benefit plans.  Sperry maintained multiple plans for its employees and retirees, while Burroughs had one plan that applied to both employees and retirees.  Unisys continued to maintain the separate Burroughs and Sperry plans for a period of time following the merger.

B.      **Unisys Corporation Implements A New Unisys Flexible Benefits Program For All Unisys Employees, Contemporaneously Advising All Employees That The Company's Welfare Benefits Are Subject To Change Or Termination At Any Time**

2.      In October 1987, Unisys' CEO W. Michael Blumenthal sent a letter to all Unisys employees announcing a new Unisys flexible benefits program, effective April 1988, that would replace most preexisting Sperry and Burroughs benefit programs, and including a Power of Choice brochure that briefly summarized the new benefits.  (See Sichel 1 at SUPP01731). Specifically, the Unisys flexible benefits program provided Unisys employees with new medical, dental, reimbursement accounts, disability, employee dependent life insurance, vacation and holiday time-off benefits.  (Id. at SUPP017376).  In addition, the brochure indicated that, in the future, retiree medical benefits would be provided under a Unisys plan, as opposed to the then-existing Sperry or Burroughs plans.  It made clear:

> The new Unisys employee benefits program is the result of months of planning and thoughtful reexamination of our employee benefits principles.  It will replace the programs now in effect from our former companies.
>
> Some elements of the prior programs have been retained. However, our goal was not merely to combine those prior programs but to develop a new program that is both progressive

1

and actively involves employees.

(Id.)

3.      Mr. Blumenthal's October 1987 letter explained that his was the first in a series of communications regarding the April 1988 shift to the Unisys flexible benefits program. The Power of Choice Brochure referenced the forthcoming communications, including a series of Benefits Briefings covering different benefit topics, and advising employees that they could use the back flap of the Benefits Briefing brochure to store these additional communications. (Id. at SUPP017381).

4.      In the Medical and Dental Benefits Briefing, Unisys explained the need for the addition of "cost management features" in the new Unisys Medical Plan for active employees, stating:

> At the same time medicine is making such strides, however, heath care costs have been escalating dramatically – at a rate three or four times the average increase in cost of living.  Professional fees, hospital room and board cost, improved technology and inappropriate use of medical resources all have combined to push health care up dramatically.  Left unchecked, as the cost to Unisys of providing medical coverage rises, it would consume a larger and larger portion of the money available for total employee compensation.
>
> In this type of environment, Unisys and most other employers find it necessary to implement medical programs which include cost management features. . . .

5.      In the spring of 1988, Unisys provided employees with a Summary Booklet, providing even more information about the terms of the Unisys flexible benefits.  On the first page of that booklet, Unisys advised employees to "[k]eep this Summary Booklet as an ongoing reference until your new Summary Plan Descriptions are distributed later this spring. The Summary Plan Descriptions will provide even more specifics, including such areas as claims procedures, covered expenses, and so on."  (See Sichel Ex. 2 at p. 1).

6.     The Summary Booklet explained how, under the Unisys flexible benefits program, each employee would receive a number of flexible credits each year based upon the number of credits needed by that employee for a particular level of medical, dental and life insurance coverage, with additional credits provided for dependents for whom employees elected coverage, albeit, only enough to subsidize a portion of that dependent coverage.  (Id. at p. 10). Employees were required to make out-of-pocket payments for the unsubsidized portion of dependent coverage and for any benefits beyond those covered by the baseline credits.

7.     In the fall of 1988, Unisys provided its employees with a formal ERISA Summary Plan Description booklet ("Flexible Benefits SPD") describing the terms of the various flexible benefit plans.  (See Sichel Ex. 3).  On the very first page of that booklet, Unisys advised employees that the Flexible Benefits SPD contained "important information" about employee benefits.  (Id. at p. 1)  The SPD further advised employees to "[k]eep this booklet handy as an ongoing reference."  Id.  Employees were told that they "should refer to this booklet in conjunction with you enrollment materials each Fall as you make your flexible benefits elections for the following year."  (Id.).

8.     The Flexible Benefits SPD contained multiple subsections, each of which described the benefits provided to employees, which were the Flexible Benefit Plan, Unisys Medical Plan, Unisys Dental Plan, Reimbursement Accounts, Unisys Short Term Disability Plan, Unisys Long Term Disability Plan, Company Provided Life Insurance, Seatbelt Insurance and Business Travel Accident Insurance.  (See generally, id.).

9.     In the section of the Flexible Benefits SPD describing the medical benefits available to Unisys employees under the Unisys Medical Plan, the Company again advised employees that medical costs were "escalating dramatically" and explained the cost-sharing

3

features of the Unisys Medical Plan, which were not a part of the Sperry and Burroughs plans.

(Id. at 28).

10.     The section of the Flexible Benefits SPD describing the medical benefits available to Unisys employees under the Unisys Medical Plan also contained clear and unequivocal reservation of rights ("ROR") language advising employees that Unisys could change or terminate the Unisys Medical Plan, and explaining that upon Plan termination, all medical coverage for participants would end.  (Id. at p. 65).  Specifically, the reservation of rights language read:

> Although the Company does not presently intend to do so, Unisys reserves the right to change or terminate the Unisys Medical Plan described in this booklet.  Should the Plan be terminated coverage for all participants would end.

(Id.)

11.     In fact, each section of the Flexible Benefits SPD contained its own separate reservation of rights language, similar to that described above.  (See id. at p. 23 (ROR for Flexible Benefits Plan); p. 83 (ROR for Dental Plan); p. 109 (ROR for Reimbursement Accounts); p. 118 (ROR for Short Term Disability Plan); p. 126 (ROR for Long Term Disability Plan); p. 134 (ROR for Company Provided Life Insurance Plan; p. 140 (ROR for Company Provided Seatbelt Insurance); p. 144 (ROR for Company Provided Business Travel Accident Insurance)).

12.     Moreover, in the Additional Plan Information section of the Flexible Benefits SPD, Unisys *again* explained to plan participants that the benefits described in the booklet were subject to change or termination:

> Unisys expects to continue the plans described in this booklet, but necessarily reserves the right to change or end them at any time. The Company's decision to change or end the plans may be due to changes in federal or state laws governing welfare benefits, the

4

> requirements of the Internal Revenue Code or ERISA, the
> provisions of a contract or policy involving an insurance company
> or any other reason. . . .

(Id. at p. 154).

### C. Consistent With Its Reservation Of Rights, Unisys Made Changes To The Medical Benefits It Provided To Employees Under The Unisys Medical Plan

13.     On October 18, 1989, Unisys sent its employees a letter that began by again reminding employees of the escalating costs of medical care. (See Sichel Ex. 8. at SUPP017790) ("The problem of increasing health care costs have received national attention."). Unisys explained that "[t]o preserve the Company's ability to offer meaningful levels of health care benefits," it was introducing a managed care feature to the Unisys Medical Plan. (Id.) This feature introduced "preferred" and "nonpreferred" care to the Unisys Medical Plan, with participants paying increased costs associated with any "nonpreferred" care. (Id. at SUPP017790-91) ("However, you will pay more for non-PPO providers in the network through higher co-payments and out-of-pocket rules.").

14.     One week later, on October 26, 1989, Unisys sent its employees a letter describing other changes to the Unisys Medical Plan, effective January 1, 1990. (See Sichel Ex. 9). Among those changes, employees for the first time were required to contribute to the cost of their medical and dental benefits. (Id. at p. 2) In addition, for those participants in an HMO, Unisys announced that " the Company subsidy will reduce from 1989 levels." (Id.).

### D. Unisys Announces That After April 1, 1989 All Retirees Will Receive Retiree Medical Benefits Pursuant To The Unisys PRM Plan, And Communicates In Clear And Unambiguous Terms That It Can Change Or Terminate That Plan At Any Time

15.     At the same time that the Company announced its new Flexible Benefits Program for employees, it advised employees that a similar change to the Company's retiree

medical benefits was forthcoming.  For example, the Summary Booklet noted that, in the future,

all retiree medical benefits would be offered under a Unisys plan, rather than under the Sperry or

Burroughs plans applicable at the time the Summary Booklet was provided to employees.

Specifically, the Booklet read;

### Post-Retirement Medical Benefits

Beginning in 1989, Unisys will offer an optional contributory post-retirement medical plan which will parallel medical option 2 for active employees.  Those who retiree prior to January 1, 1989 will continue to be eligible for the post-retirement program offered to current retirees.[1]

It is anticipated that contributions for the Unisys Post-Retirement Medical Plan will be based on service and dependents you choose to cover.  Those with longer service at retirement will be provided with greater company subsidy, and will pay less than those with shorter service.  More information will be made available on the contribution rates before January 1, 1989.

(See Sichel Ex. 2 at p. 48).  Similarly, the Flexible Benefits SPD advised employees of the

forthcoming change that would require future retirees to receive retiree medical coverage

pursuant to the terms of a Unisys plan, rather than a Sperry or Burroughs Post-Retirement

Medical Plan.  (See Sichel Ex. 3 at p. 67).  In February 1989, Unisys announced to its employees

that it was implementing the Unisys Post-Retirement and Extended Disability Medical Plan (the

"Unisys PRM Plan") for employees who retired after April 1989.

      16.     The announcement of the Unisys PRM Plan was communicated in a letter

from Mr. Blaine to all employees who were eligible to retire at the time.  (See Sichel Ex. 4).  The

letter was mailed to the homes of all active employees who were age 55 with 10 or more years of

---

[1]    The January 1, 1989 date was later pushed back to April 1, 1989.

service as of April 1, 1989.  (See 10/24/05 Tr., attached hereto as Ex. A, 201:22-204:1).[2]

17.    The February 1989 Blaine letter described the new Unisys PRM Plan, and informed employees that those who retired after April 1, 1989 would only be eligible to participate in that Plan.  (See Sichel Ex. 4).  The communication further informed employees that those who retired prior to April 1, 1989 were eligible to receive medical benefits under the Burroughs or Sperry Medical plans, depending upon the pre-merger company with which they had worked.  (Id.).  The letter advised employees that "[t]his is the final major benefits area to be brought under a common program for the former Burroughs and Sperry organizations."

18.    The February 1989 Blaine letter made it clear that the Unisys PRM Plan had the same "plan design" features as existed under "Option 2" in the Unisys Medical Plan.

19.    The February 1989 Blaine letter also had several attachments that described the changes to retiree medical benefits.  (Id.).  Attachment 1 was the Unisys Post-Retirement And Extended Disability Medical Plan Summary Of Plan Provisions ("Unisys PRM SPD").  The Unisys PRM SPD incorporated by reference the 1988 Flexible Benefits SPD, stating "[u]nless noted otherwise, the provisions are the same as the Unisys Medical Plan Option 2 described in your Summary Plan Description Booklet, which was distributed last Fall with your 1989 flexible benefit enrollment materials."  (Id. at Attachment 1, p. 1).

20.    The monthly contributions paid by a retiree participating in the Unisys PRM Plan were based on:  the cost of the Plan in the year participation begins; the number of points represented by the sum of the individual's age and service; and whether or not covered dependents were eligible for Medicare.  (Id. at Attachment 1, p. 2).  As Judge Cahn ruled during the class action ruling on the trial of the Unisys Early Retirees, "The Unisys Plan was clearly a

---

[2]    There was testimony regarding the February 1989 Blaine letter at the October 2005 trial of 12 retirees who retired under the Burroughs Medical Plan.  Excerpts of the relevant portions of cited transcript are attached hereto.

less generous plan than its predecessors." In re Unisys Corp. Retiree Med. Benefits ERISA

Litig., MDL 969, 1994 WL 284079, *29 (E.D. Pa. June 23, 1994).

      21.    Because Unisys determined the amount of contribution at the time of

participation, an employee did not know what rates he or she would pay until retirement.   In

addition, the Unisys PRM Summary made it clear that the rates a retiree paid for medical

coverage under the plan **could change** after retirement.  It stated:

> Unisys will attempt to maintain your contributions at the levels in
> effect during the year in which your participation begins.
> However, this cannot be guaranteed, given the unpredictable
> conditions which continue to influence post-retirement medical
> coverage, such as rising medical costs and legislative actions.

(Id.).

      22.    In addition, the Unisys PRM SPD also explicitly informed employees of

the Company's right to change or terminate the Unisys Post-Retirement And Extended Disability

Medical Plan:

> **Plan Termination/Revision**
>
> As with other benefit programs, the Company reserves the right to
> change or terminate the Unisys Post-Retirement and Extended
> Disability Medical Plan.  Should the Plan be terminated, coverage
> for all participants would end.

(Id. at Attachment 1, p. 3).

      23.    As Judge Cahn has already ruled, this reservation of rights language in the

Unisys PRM Plan was "unambiguous" and "gave Unisys the right to terminate the plan

completely." In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 1994 WL 284079, at *30.

**E.      After Distributing The Unisys PRM SPD, Unisys Continued To Advise
Employees Of Its Right To Change Or Terminate The Unisys PRM Plan**

24.      On September 25, 1989, Unisys sent a letter to the homes of eligible
employees announcing a Voluntary Retirement Incentive Program (the "September 1989
VERIP").  (See Sichel Ex. 6; see also In re Unisys Corp. Retiree Med. Benefit ERISA Litig.,
1994 WL 284079, at *30 ("Unisys sent eligible employees a packet of information to help them
make their decisions.")).

25.      In addition to enhanced pension benefits, the September 1989 VERIP
described "Other Benefits Following Retirement."   This section made it clear that an employee
electing the VERIP would be covered by the Unisys PRM Plan, but that by virtue of agreeing to
the VERIP, the retiree would receive an enhancement of two years toward age and service for
purposes of determining the contribution rate.  (See Sichel Ex. 6 at p. 30).  As Judge Cahn has
previously held, "Unisys specifically alerted the VERIP participants, in the VERIP offering
document, that the contribution rates were not guaranteed,"   In re Unisys Corp. Retiree Med.
Benefits ERISA Litig., 1994 WL 284079, at *30.  In fact, the September 1989 VERIP document
repeats the same unambiguous language found in the Unisys PRM SPD:

> Unisys will attempt to maintain your contributions at the levels in
> effect during the year in which your participation begins.
> However, this cannot be guaranteed, given the unpredictable
> conditions that continue to influence post-retirement medical
> coverage, such as rising medical costs and legislative actions.

(See Sichel Ex. 6 at p. 31).

26.      On June 29, 1991, Unisys sent a letter to the homes of eligible employees
announcing another Voluntary Retirement Incentive Program (the "June 1991 VERIP").  (See
Sichel Ex. 7; see also In re Unisys Corp. Retiree Med. Benefit ERISA Litig., 1994 WL 284079,

9

at *31 ("Unisys sent eligible employees a packet of information to help them make their election.")).

27.     Like the September 1989 VERIP, the June 1991 VERIP made it clear that an employee electing the VERIP would be covered by the Unisys PRM Plan, with the only difference being that the age requirement for participation was reduced from age 55 to age 54. (See Sichel Ex. 7 at p. 20).

28.     As Judge Cahn held, "this offering document was even more explicit in its statement that the benefits were not guaranteed"  In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 1994 WL 284079, at *31.  In fact, the June 1991 VERIP document states:

> The Unisys Post-Retirement and Extended Disability Medical Plan provides the same coverages as the Unisys Medical Plan Option 2 available through the Unisys Flexible Benefits Program.   *Unisys cannot, however, guarantee that post-retirement medical coverage will not be changed in the future.   The Company continues to reserve the right to modify or terminate this coverage at any time.*
>
> \*          \*          \*
>
> **Although Unisys will attempt to maintain your contributions at the levels in effect during the year in which your participation begins, the Company cannot guarantee that the contribution levels will remain unchanged in the future.   The Company continues to reserve the right to increase contribution levels at any time.**

(See Sichel Ex. 7 at p. 19-20 (emphasis in original)).  Pointing to that language, Judge Cahn found, "The court finds that Unisys unambiguously reserved its right to increase contribution rates and/or terminate the medical plan."  In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 1994 WL 284079, at *32.

**F.     Unisys Employees Who Sign COBRA Forms Are Reminded That The Company Can Change Or Terminate Its Welfare Benefit Plans**

29.     Any employee who left Unisys was presented with a COBRA form prior to his or her departure.  (See, e.g., Sichel Ex. 23).  At the top of the form, under the heading

10

"Read This First," the form provides:  "**Important**:  A statement of your rights and obligations

in relation to continuing group health coverage is printed on the back of this form.  Please read it

carefully."  (<u>Id.</u>)  The COBRA form also contains an acknowledgement directly above the

signature line that the employee has read the back of the form:  "I have read and understand the

statement on the reverse side of this form."  (<u>Id.</u>)

        30.    The back of the COBRA form unambiguously states that Unisys has the

right to change or discontinue medical coverage:

> Benefits:   Your benefits under the Continuation of Coverage are
> the same as benefits provided for plan participants who have not
> had a qualifying event.  All provisions and limitations of the plan
> remain applicable.  Unisys reserves the right to change or modify
> its group health plans.  Such changes will also apply to your
> Continuation Coverage.
>
>         *        *        *
>
> When coverage ends:  Your continuation coverage will end when
> any one of the following occurs:
>
>         *        *        *
>
> 4.  Unisys discontinues providing any group health plan.

(<u>Id.</u>)

      **G.**      **Unisys Continued To Remind Employees Who Had Retired But Deferred Participation In The Unisys PRM Plan Of Its Right To Change Or Terminate That Plan**

        31.    Periodically, between April 1, 1989 and November 1992, Unisys would

announce layoff programs.  Some employees whose employement with Unisys ended under one

of these programs would elect to continue to participate in the Unisys Medical Plan for active

employees through the Unisys' COBRA offering, rather than begin participation in the Unisys

PRM Plan immediately.

32.     Unisys changed the Unisys PRM Plan to provide that effective January 1, 1992, anyone who began participating in the Plan would not receive any subsidy for retiree medical benefits once they were eligible for Medicare.  Because at that time Unisys decided not to apply this change to anyone who began participation prior to January 1, 1992, the Company sent a letter to individuals who had deferred participation in the Unisys PRM.  (See Sichel Exs. 16, 29).  One version of the letter was sent to those who had deferred participation and were eligible to participate on or before January 1, 1992, and another version to those who had deferred participation but were not eligible on or before January 1, 1992.  (See Sichel Exs. 16, 29).

33.     Both versions of the letter made it clear that, although Unisys was not applying that change to those who began participation on or before January 1, 1992, it reserved the right to do so, or to otherwise change or terminate the plan in the future.  Specifically, both letters contain the following language:

> Those who begin participation in the Unisys Plan on or before January 1, 1992 will not be affected by this change at this time. Unisys continues to reserve the right to modify or terminate this coverage at any time, however.

(Sichel Ex. 16 at p.1; Sichel Ex. 29 at p.1).

34.     The letter to those eligible to participate on or before Januray 1, 1992 also contained an attachment with the rates they would pay for retiree medical coverage with the following note:

> NOTE:  Although Unisys will attempt to maintain your contributions at the level in effect during the year in which your participation begins, the Company cannot guarantee that contribution levels will remian unchanged in the future.  Unisys reserves the right to increase contribution levels at any time.

(See Sichel Ex. 16 at Attachment 1).  Similar language appeared in Attachment 3 of the letter,

among information provided by Unisys for employees to consider before deciding whether or not

to defer participation past January 1, 1992.

      35.    Similarly, the letter to those eligible to participate only after Januray 1,

1992 repeatedly advised employees of the Company's reserved right to change or terminate the

Unisys PRM Plan.  Specifically, that letter referenced an attached chart of the costs for

participation after January 1, 1992, followed with this language:

> NOTE:  Although Unisys will attempt to maintain your pre-
> Medicare contributions at the level in effect during the year in
> which your participation begins, the Company cannot guarantee
> that contribution levels will remian unchanged in the futuire.
> Unisys reserves the right to increase contribution levels at any
> time.

(See Sichel Ex. 29 at p. 2).  The attachment itself contained the exact same note again advising

employees that the rates they paid for medical benefits could change at any time.  (See id. at

Attachment 2).

    **H.**    **Unisys Annually Exercised Its Right To Make Changes To The Unisys PRM Plan**

      36.    On November 13, 1989, Unisys sent a letter to participants in the Unisys

PRM Plan advising them that their medical benefits would be subject to the same managed care

feature described above with respect to the benefits provided to employees.  See Sichel Ex. 10.

Like the letter to employees, this letter began by again reminding Unisys PRM Plan participants

of the escalating costs of medical care.  (See Id. at SUPP017744) ("The problem of increasing

health care costs have received national attention.").  Unisys explained that the new managed

care feature introduced "preferred" and "nonpreferred" care to the Unisys PRM Plan, with

participants paying increased costs associated with any "nonpreferred" care.  (Id. at

13

SUPP017744-45) ("However, you will pay more for non-PPO providers in the network through higher co-payments and out-of-pocket rules."). On December 26, 1989, Unisys sent its retirees a letter to employees enclosing a brochure with more information regarding this change. (See Sichel Ex. 11). A similar letter was sent to those individuals who were on disability leave scheduled to end on or before December 31, 1989 and who were eligible to participate in the Unisys PRM Plan. See Sichel Ex. 12.

       37.    On November 15, 1990, Unisys sent a letter to participants in the Unisys PRM Plan providing them with the opportunity to switch to an HMO (or from an HMO into the Unisys Plan). (See Sichel Ex. 13). This communication also advised Unisys PRM Plan participants of changes that would be made to the Plan effective January 1, 1991. (Id.) Specifically, in the attached Summary of Plan Changes for the Unisys Post Retirement And Extended Disbility Medical Plan For 1991, Unisys advised participants that it was decreasing the Company's co-payment rate from 85% to 80% for preferred care, and from 65% to 60% for nonpreferred care, resulting in greater out-of-pocket expenses for Plan participants. (Id. at Attachment 1, p. 2). In addition, the annual family out-of-pocket maximums were increased. (Id.) The November 15, 1990 letter also included an attachment describing participants' contributions, which included the following provision:

> **Note:**  Unisys will attempt to maintain your contributions at the levels in effect during the year in which your participation begins. However, this cannot be gauranteed, given the unpredictable conditions that continue to influence medical coverage for retirees and disabled individuals, such as rising medical costs and legislative actions.

(Id. at Attachment 5, p. 1).

38.     A similar letter and attachments was sent to those disabled employees whose short term disability benefits were going to expire before December 31, 1990 and who were eligible to participate in the Unisys PRM Plan.  (See Sichel Ex. 14).

39.     In November 1991, Unisys sent a letter to participants in the Unisys PRM Plan announcing changes to the retiree medical benefits they received effective January 1, 1992. Included with that letter was a Booklet describing the changes.  (See Sichel Ex. 15).  Among the changes described, Unisys advised participants that it was increasing their co-payments for the Unisys Mail Service Prescription Drug Program and increasing out-of-pocket maximums for nonpreferred care.  (Id. at Attachment, Bates No. 058284.)

## II.    Undisputed Facts Applicable To Individual Plaintiffs' BOFD Claims

### A.    Frank Mahoney

#### a.    Employment History And Background Information

40.     Mr. Mahoney began working for Sperry in 1961.  In 1969 he left Sperry to work for a company called NavCore.  Mr. Mahoney returned to Sperry approximately six months after leaving to work for NavCore and continued working at Sperry through the merger of Sperry and Burroughs to form Unisys in 1986.  (Mahoney Tr. 12:2 – 13:1).

41.     Mr. Mahoney's employment with Unisys ended on January 29, 1991. (Mahoney Ex. 7, p. 4).

42.     Mr. Mahoney passed away on October 6, 2004.  (Mahoney Tr. 11:18-19). He was survived by his spouse, Marguerite Mahoney.  (Mahoney Tr. 11:9-19).

43.     Mr. Mahoney prepared, verified, and signed responses to Unisys' 1999 discovery requests.  (Mahoney Ex. 7; Mahoney Tr. 33:20 – 34:20).  Ms. Mahoney, his surviving spouse, prepared, verified, and signed responses to Unisys' 2004 discovery requests after her husband had passed away.  (Mahoney Ex. 1; Mahoney Tr. 16:21 – 17:22; 18:14-18).  Ms.

Mahoney was deposed on April 23, 2010 in connection with the instant litigation.  (Mahoney Tr. 1:13-16).

### b.      Oral Communications About The Unisys PRM Plan

44.      Mr. Mahoney never made any indication in his 1999 discovery responses that he was told his retirement medical benefits were guaranteed, or that they would be for life. Mr. Mahoney's responses to Unisys' 1999 discovery requests described only one conversation regarding his retirement medical benefits.  Mr. Mahoney claimed that he had a conversation with Human Resources Representative Mike Oglinski before his last day at Unisys.  Mr. Mahoney described the conversation as follows:

> c.      What did the individual say about retiree medical benefits?  Please indicate whether you are quoting directly or paraphrasing.
>
> Mike presented me with a document that showed what the cost of the Unisys retiree medical benefits would be for my spouse and me, based upon my age and years of service with the company.  Mike pointed out I was in the 85-94 point range and that I would pay $95/month to cover my spouse and me until age 65.  Once we became age 65, we would pay $38/month.

(Mahoney Ex. 7, p. 4).

45.      Ms. Mahoney was not present for her husband's alleged conversation with Mr. Oglinski, and never met Mr. Oglinski.  (Mahoney Tr.  24:21-24; 30:23 – 31:2).

46.      Ms. Mahoney claims that, after his conversation with Mr. Oglinski, her husband related to her that Mr. Oglinski had told him the numbers on the chart they had discussed represented the cost of Mr. Mahoney's retirement medical benefits "for life." (Mahoney Tr. 32:16 – 33:11.)

16

###### c.    Written Communications About The Unisys PRM Plan

47.    Ms. Mahoney testified that, during her husband's employment with Sperry and then Unisys, she never personally received documents regarding her husband's employment or benefits.  (Mahoney Tr. 13:12-24).

48.    Ms. Mahoney admitted that she does not know what documents her husband received from Unisys regarding his benefits, other than one chart describing the costs of post-retirement medical coverage that she claims her husband showed to her, and the February 1989 letter from J.A. Blaine to Employees Who Are Eligible To Retire With Post-Retirement Medical Benefits.  (Mahoney Ex. 1, p. 10; Ex. 2; Mahoney Tr. 15:2-7; 17:23 – 19:21; 20:14 – 21:10).  The February 1989 letter from J.A. Blaine contained clear and unambiguous reservation of rights language.  (Mahoney Ex. 2).

49.    Ms. Mahoney testified that her husband's employment with Unisys ended as the result of a voluntary layoff in 1991.  (Mahoney Tr. 30:19-22).  The Workforce Reduction packet given to all employees who, like Mr. Mahoney, participated in the voluntary layoff program in 1991, explicitly provided that post-retirement medical benefits for those employees who took voluntary layoffs would be provided pursuant to the Unisys PRM Plan.  (Sichel Ex. 24).

#### B.    <u>Wallace George</u>

###### a.    Employment History

50.    Mr. George began working for Burroughs in January of 1952 and continued working at Burroughs through the merger of Burroughs and Sperry to form Unisys in 1986.  (George Ex. 3, p. 4; George Tr. 12:16-22).

51.    Mr. George's employment with Unisys ended in December of 1989.  (George Tr. 12:13-15).

### b.     Written Communications About The Unisys PRM Plan

52.     During his employment with Unisys, Mr. George received

communications from Unisys at his home through the mail.  (George Tr. 43:5-11).

53.     In Mr. George's responses to Unisys' 2004 discovery requests, which he

made every effort to ensure were accurate and complete, Mr. George stated that he received the

Unisys Flexible Benefits SPD and he produced a copy of that SPD as an attachment to his

discovery responses.  (George Ex. 1; Ex 2 p. 11; George Tr. 34:5 – 35:20).

54.     Mr. George admitted that if he had read the reservation of rights language

contained in the Flexible Benefits SPD, he would have understood that Unisys reserved the right

to change or terminate the benefits it offered to employees, including the benefits under its

medical plan.  (George Ex. 1; George Tr. 45:22 – 46:3; 49:5-12).

55.     Mr. George admitted, both in his 2004 discovery responses and during his

deposition, that while still an employee at Unisys, he received the February 1989 letter from J.A.

Blaine to Employees Who Are Eligible To Retire With Post-Retirement Medical Benefits, which

contained clear and unambiguous reservation of rights language.  (George Ex. 2, p. 11; Ex. 3;

George Tr. 55:15 – 56:1).  Mr. George further admitted that he read the letter when he received

it:

> Q.     Before we went on break, I'd ask[ed] you if there was any
> reason why you would have responded in 2004 that you received
> the 1989 Blaine memo as an employee of Unisys if that were not
> true.  Can you answer that question?
>
> A.     The Blaine memo, I received that, yeah.
>
> Q.     And you received that while an employee?
>
> A.     Yes.
>
> Q.     Did you read this document when you received it?
>
> A.     When I received it I did, yes.

(George Tr. 55:15 – 56:4).

56.     Mr. George admitted that he read and understood the language in the

February 1989 Blaine letter about the drastic increase in medical costs:

> Q.     If you look in the third paragraph of this document, it
> references, or it states, "Medical costs have been escalating
> dramatically – at a rate three or four times the average increase in
> the cost of living."  Did you read that provision when you received
> this document?
>
> A.     Yes.
>
> Q.     And did you understand that Unisys was discussing the
> increase in medical costs that were occurring in society?
>
> A.     Yes.

(George Tr. 57:22 – 58:11).

57.     More importantly, Mr. George admitted that he read the reservation of

rights language in the Unisys PRM SPD attached to the February 1989 Blaine letter:

> Q.     And if you'll turn to the third page of Attachment 1, which
> is two pages after the page we just referred to.  It states at the top
> of that page, "Your contributions will be determined in the year
> you begin participation.  If you defer participation, your
> contributions will be based on the schedule in effect at the time
> you enroll."
>
> "Unisys will attempt to maintain your contributions at the levels in
> effect during the year in which your participation begins.
> However, this cannot be guaranteed, given the unpredictable
> conditions which continue to influence post-retirement medical
> coverage, such as rising medical costs and legislative action."
>
> Do you see that?
>
> A.     Yes.
>
> Q.     Did you read those two paragraphs when you received this
> document?
>
> A.     Yes.
>
> Q.     And did you understand as a result of reading those
> paragraphs that Unisys did not guarantee that your contribution
> levels would be the same as they were in the year in which you
> began participating in the Unisys post-retirement medical plan?
>
> A.     I don't recall.
>
> Q.     As you sit here today, do you understand that that's what

19

that paragraph says?

A.    Yes.

Q.    If you look at . . . page 3 of [the Unisys PRM SPD], the last paragraph, it's labeled "Plan Termination/Revision."  It says, "As with other benefit programs, the company reserves the right to change or terminate the Unisys PRM Plan.  Should the plan be terminated, coverage for all participants would end."

A.    Yes.

Q.    Did you read that provision whenever you received this document?

A.    Yes.

(George Tr. 62:2 – 64:3).

58.    Critically, Mr. George admitted that, after reading the "Plan Termination/Revision" section of the February 1989 Blaine letter, he understood that Unisys had the right to change or terminate his post-retirement medical benefits

Q.    As a result of reading that provision, ***did you understand that Unisys could terminate or change the terms of the Unisys PRM Plan?***

A.    ***Yes.***

(George Tr. 64:4-9) (emphasis supplied).

59.    During examination by his own attorney, Mr. George delivered testimony regarding the February 1989 Blaine letter that flatly contradicted his earlier testimony on direct examination.  On re-direct examination, however, Mr. George twice affirmed that he had testified truthfully and accurately on direct examination, and that there was no reason why his answers would have been inaccurate.  (George Tr. 128:6-22; 133:1-17).

60.    In response to Unisys' 2004 discovery requests, Mr. George also produced a packet describing the September 1989 VERIP.  (George Ex. 2; Ex. 5; George Tr. 66:24 – 69:1).  Mr. George admitted that he must have been given this packet while he was a Unisys employee.

(George Tr. 68:22 – 69:1).  Mr. George admitted that he read and understood the clear and

unambiguous reservation of rights language contained in the packet:

> Q.      Okay.  If you'll look at the highlighted provision on page
> 34, it says, "Note: Unisys will attempt to maintain your
> contributions at the levels in effect during the year in which your
> participation begins.  However, this cannot be guaranteed, given
> the unpredictable conditions that continue to influence post-
> retirement medical coverage, such as rising medical costs and
> legislative action."
>
> Do you see that?
>
> A.      Yes, I see it.
>
> Q.      Did you read that when you received this document?
>
> A.      Yes.
>
> Q.      And did you understand that Unisys was unable to
> guarantee that contribution levels would remain the same?
>
> A.      Yes.

(George Ex. 5, p. 34; George Tr. 70:11 – 71:1).

61.      Mr. George was eligible to participate in the September 1989 VERIP that

the packet described, but he chose not to do so because there were greater financial incentives for

him to participate in the voluntary layoff program that was occurring at the same time.  (George

Tr. 72:6-24).

62.      In response to Unisys' 2004 discovery requests, Mr. George also produced

a fully executed copy of his Voluntary Layoff Request pursuant to the 1989 Reduction-In-Force.

This form was an attachment to the Workforce Reduction packet given to all employees who,

like George, participated in the voluntary layoff program in 1989.  (Barnes Ex. 7).  That packet

explicitly provided that post-retirement medical benefits for those employees who took voluntary

layoffs would be provided pursuant to the Unisys PRM Plan.  (Barnes Ex. 7, p. 20).

      **c.**      **Oral Communications About The Unisys PRM Plan**

63.     Mr. George interacted with Unisys Human Resource Representatives when he was employed by Unisys, including Sandy Wolownik.  (George Tr. 17:16 – 18:2).

64.     These Human Resource Representatives were located in the same building where Mr. George worked during the last years of his employment with Unisys.  (George Tr. 15:1-22).

65.     Mr. George never asked anyone at Unisys if the Company had the right, if it later decided to do so, to terminate the Unisys PRM Plan.  (George Tr. 44:17 – 45:21).

66.     Mr. George claims that he met with Sandy Wolownik in October of 1989, and that Ms. Wolownik told him that he would have retirement medical benefits for life and that the cost of those benefits would not change.  (George Tr. 90:14 – 91:22).

    **C.**      <u>**Robert Barnes**</u>

      **a.**      **Employment History**

67.     Mr. Barnes began working for Burroughs in December of 1955 and continued working at Burroughs through the merger of Burroughs and Sperry to form Unisys in 1986.  (Barnes Tr. 11:6 – 12:8).

68.     Mr. Barnes understood that, in 1988, after the merger of Burroughs and Sperry, Unisys started a new benefits program for its employees that was different from the Burroughs plan, and that the new plan applied to retiree medical benefits.  (Barnes Tr. 34:24 – 35:11).  This "made all the sense in the world" to Mr. Barnes.  (Barnes Tr. 37:21 – 38:2)

69.     Mr. Barnes' employment with Unisys ended in February of 1990.  (Barnes Ex. 5, p. 4; Barnes Tr. 12:2-4).

### b.      Written Communications About The Unisys PRM Plan

70.      During his employment with Unisys, Mr. Barnes received communications from Unisys regarding his benefits, including an annual benefits package sent to his home every year through the mail.  (Barnes Tr. 47:1-10).

71.      Mr. Barnes testified that he generally would not read the documents about benefits that he received from Unisys:

> Q.      Typically, when you received documents about benefits from Unisys, would you read them?
>
> A.      For the most part, no.
>
> Q.      Why not?
>
> A.      I was satisfied that the company was going to provide me with what benefits were available.  I wasn't particularly interested in the details.

(Barnes Tr. 33:3-11).

72.      In Mr. Barnes' responses to Unisys' 2004 discovery requests, which he made every effort to ensure were accurate and complete, Mr. Barnes stated that he received summary plan descriptions describing the medical benefits to which he was entitled while an active employee .  (Barnes Ex. 5, p. 10).  Mr. Barnes testified that he received such summaries on a yearly basis.  (Barnes Tr. 6-9).  Mr. Barnes attached one page of the Flexible Benefits Summary Booklet distributed to Unisys employees in Spring of 1988.  (Barnes Ex. 1).  At his deposition, Mr. Barnes admitted that he may only have submitted excerpts of some of the documents in his possession.  (Barnes Tr. 31:13 – 32:8).

73.      In response to Unisys' 2004 discovery requests, Mr. Barnes also produced excerpts of a packet describing the September 1989 VERIP.  (Barnes Ex. 4; Barnes Tr. 80:6 – 81:2).  Mr. Barnes admitted that he must have been given this packet while he was a Unisys employee.  (Barnes Tr. 68:22 – 69:1).  Mr. Barnes further admitted that the excerpts he produced

were identical to the pages of a complete copy of the packet produced by another plaintiff in this

litigation.  (Barnes Tr. 82:1-19).  The complete packet contained clear and unambiguous

reservation of rights language.  (Sichel Ex. 6, p. 34 ).

74.     Mr. Barnes did not participate in the September 1989 VERIP that the

packet described and instead took a voluntary layoff as part of a 1989 Reduction-In-Force

program.  (Barnes 82:20 – 83:10).

75.     In response to Unisys' 2004 discovery requests, Mr. Barnes also produced

excerpts of the Workforce Reduction packet given to all employees who, like Mr. Barnes,

participated in the voluntary layoff program in 1989.  (Barnes Ex. 6; Barnes Tr. 95:22 – 96:5).

Mr. Barnes admitted that the excerpts he produced appeared to be selected pages of the complete

packet, a copy of which was produced by another plaintiff in this litigation.  (Barnes Exs. 6-7;

Barnes Tr. 100:14 – 102:17).  That packet explicitly provided that post-retirement medical

benefits for those employees who took voluntary layoffs would be provided pursuant to the

Unisys PRM Plan.  (Barnes Ex. 7, p. 20).

76.     In his response to Unisys' 1999 discovery requests, Mr. Barnes admitted

that he received the February 1989 letter from J.A. Blaine to Employees Who Are Eligible To

Retire With Post-Retirement Medical Benefits, and Mr. Barnes produced a copy of the February

1989 Blaine letter as an attachment to his discovery responses.  (Barnes Ex. 3, p.6).  This letter

contained clear and unambiguous reservation of rights language.  (Barnes Ex. 2, Attachment 1 p.

3).

77.     In response to Unisys' 1999 discovery requests, Mr. Barnes also produced

excerpts of a Burroughs medical plan summary from 1985.  (Barnes Ex. 9; Barnes Tr. 120:18 –

121:6).  Mr. Barnes admitted that the excerpts he produced appeared to be selected pages from

24

the summary, a copy of which was produced by another plaintiff in this litigation.  (Barnes Tr. 124:10 – 125:23.)  The complete summary contained clear and unambiguous reservation of rights language.  (Barnes Ex. 10, p. 007964).

### c.      Oral Communications About The Unisys PRM Plan

78.     Mr. Barnes interacted with Unisys Human Resource Representatives when he was employed by Unisys, including Angelo Bellace.  (Barnes Tr. 16:10 – 17:20).

79.     These Human Resource Representatives were located in the same building where Mr. Barnes worked during the last years of his employment with Unisys.  (Barnes Tr. 15:14-21; 16:10-19).

80.     Mr. Barnes remembers discussing the February 1989 letter from J.A. Blaine to Employees Who Are Eligible To Retire With Post-Retirement Medical Benefits with Mr. Bellace.  (Barnes Tr. 50:17; 52:16 – 53:4; 53:11-17).  This letter contained clear and unambiguous reservation of rights language.  (Barnes Ex. 2, Attachment 1 p. 3).  Mr. Barnes did not speak with Mr. Bellace about the reservation of rights language.  (Barnes Tr. 59:11-14).  Nor did Mr. Barnes ever discuss the possibility of plan termination with Mr. Bellace.  (Barnes Tr. 78:11-14).

81.     Mr. Barnes claims that, in 1989, Mr. Bellace told him he would have retirement medical benefits for the rest of his life.  (Barnes Tr. 59:20 – 61:10).

82.     In Mr. Barnes' responses to Unisys' 1999 discovery requests, however, Mr. Barnes' description of his conversation with Mr. Bellace did not include any mention of a statement by Mr. Bellace that Mr. Barnes would have retirement medical benefits for the rest of his life:

> c.      What did the individual say about retiree medical benefits?
> Please indicate whether you are quoting directly or paraphrasing.

25

> We discussed what we both understood the retiree medical benefits
> to be from the J.A. Blaine memo and other information available at
> the time and that the company would provide retiree medical
> benefits at a reasonable cost.  This was an important consideration
> when trying to determine living costs after retirement.  The
> possibility of plan termination was never discussed.

(Barnes Ex. 3, p. 4).  Mr. Barnes testified that he reviewed and verified his responses to Unisys'

1999 discovery requests, and that he made sure his answers were truthful, accurate and complete

to the best of his knowledge.  (Barnes Tr. 68:11 – 69:14).

### D.  **Madeline King**

#### a.  **Employment History**

83.  Ms. King began working for Sperry in July of 1978 and continued

working at Sperry through the merger of Sperry and Burroughs to form Unisys in 1986.  (King

Tr. 12:13 – 13:2).

84.  Ms. King's employment with Unisys ended in November of 1989.  (King

Tr. 12:10-12).

#### b.  **Written Communications About The Unisys PRM Plan**

85.  During her employment with Unisys, Ms. King received communications

from Unisys regarding her benefits at her mail station at work.  (King Tr. 19:7 – 20:18).

86.  In Ms. King's responses to Unisys' 2004 discovery requests, which she

made every effort to ensure were accurate and complete, Ms. King stated that she received

summary plan descriptions describing the medical benefits to which she was entitled while an

active employee .  (King Ex. 15, pp. 10, 12; King Tr. 130:11 – 132:3).

87.  At her deposition, Ms. King admitted that she also received the February

1989 letter from J.A. Blaine to Employees Who Are Eligible To Retire With Post-Retirement

Medical Benefits while still a Unisys employee, and that she read this letter when she received it.

(King Tr. 44:24 – 45:24).  Ms. King produced a copy of the February 1989 letter as an

attachment to her responses to Unisys' 1999 discovery requests.  (King Ex. 2-3).  The first

attachment to this letter, the Unisys PRM SPD, contained clear and unambiguous reservation of

rights language.  (King Ex. 3, Attachment 1 p. 3).  During her deposition, Ms. King admitted that

she understood this reservation of rights language:

> Q.      As you sit here today -
>
> A.      Yes.
>
> Q.      - you understand that the last provision on page 3 of 3 [of
> the Unisys PRM SPD] provides that the company has the right to
> change or terminate the Unisys Post-Retirement and Extended
> Disability Medical Plan?
>
> A.      It's very clear.  Yes.
>
> Q.      And as you sit here today, do you understand that the
> second paragraph on page 3 of 3 provides that the company can't
> guarantee that the cost of retiree medical coverage will remain the
> same as it is in the year in which you began to participate in the
> plan?
>
> A.      As I read it today, yes.
>
> Q.      And is that also very clear?
>
> A.      Today, yes.

(King Tr. 55:15 – 56:9).  Ms. King admitted that she does not recall having any conversations

with anyone about the February 1989 letter from J.A. Blaine.  (King Tr. 55:4-14).

88.      Ms. King also separately produced a copy of the attachments to the

February 1989 letter from J.A. Blaine, including the Unisys PRM SPD, with her responses to

Unisys' 1999 discovery requests.  (King Ex. 7).  Ms. King testified that she received this

document on August 9, 1989, and that she "guessed" she read it.  (King Tr. 86:12 – 87:18).  This

copy of the attachments contains handwritten notations, which Ms. King testified were made by

her while she was still employed by Unisys.  (King Tr. 87:3 – 88:9).

89.     In response to Unisys' 1999 discovery requests, Ms. King also produced excerpts of the Workforce Reduction packet given to all employees who, like Ms. King, participated in the voluntary layoff program in 1989.  (King Exs. 2; 8; King Tr. 94:4-19; 96:5-10).  That packet explicitly provided that post-retirement medical benefits for those employees who took voluntary layoffs would be provided pursuant to the Unisys PRM Plan.  (Barnes 7, p. 20).

90.     Ms. King signed a COBRA form which included reservation of rights language on the back.  (King Exs. 11-12, King Tr. 106:5-18).  Above Ms. King's signature, the COBRA form states "I have read and understand the statement on the reverse side of this form." (King Exs. 11-12).  While Ms. King at first claimed that she did not read the reservation of rights language on the COBRA form, she later admitted that "there was no reason that [she] would have said that [she] had read the back side of the form if [she] hadn't[.]"  (King Tr. 109:9-12).

c.      **Oral Communications About The Unisys PRM Plan**

91.     Ms. King interacted with Unisys Human Resource Representatives when she was employed by Unisys, including Mary Pat Consalvo and Anne Pyle.  (King Tr. 15:16 – 16:14).

92.     These Human Resource Representatives were located in the same building where Ms. King worked during the last year of her employment with Unisys.  (King Tr. 16:15 – 17:5; 17:8-17).

93.     Ms. King claims that she had a conversation about retirement benefits with Richard McCarthy, a manager in her department, when she was deciding whether to take a voluntary layoff from Unisys.  (King Tr. 68:19 – 69:14).  Ms. King admitted that she did not remember the words that Mr. McCarthy used, but she claimed that "it was implied, if not said

directly" that she would have medical benefits for life and "[t]hat was how [she] perceived it."

(King Tr. 69:15 – 70:17).

94.     In Ms. King's responses to Unisys' 1999 discovery requests, however, Ms.

King's description of her conversation with Mr. McCarthy did not include any mention of a

statement by Mr. McCarthy that Ms. King would have retirement medical benefits for life:

> c.      What did the individual say about retiree medical benefits?
> Please indicate whether you are quoting directly or paraphrasing.
>
> Paraphrase: Mr. McCarthy stated that it was worth taking the
> package because of the medical benefits.  He stated that you would
> not find this coverage anywhere, at the affordable rate Unisys was
> offering.

(King Ex. 2, p. 4).  Ms. King testified that she made every effort to provide accurate and

complete responses to Unisys' 1999 discovery requests.  (King Tr. 32:3 – 33:10).

95.     Ms. King admitted that, other than this conversation with Mr. McCarthy,

she did not recall speaking with anyone at Unisys about her retiree medical benefits.  (King Tr.

74:6-14).

96.     During her deposition, Ms. King admitted that she did not know the basis

of her belief that Unisys could not change or terminate her retirement medical benefits:

> Q.      Okay.  My question is whether or not, when you retired,
> you had an understanding as to whether or not the company would
> change the cost of your retiree medical coverage?
>
> A.      I did not believe the company had the right to change the
> cost of my coverage.
>
> Q.      And upon what did you base that belief?
>
> A.      *I have no idea.*

(King Tr. 125:8-18) (emphasis supplied).

E.     **Bernard Zaber**

    a.     **Employment History**

    97.     Mr. Zaber began working for Burroughs in August of 1955 and continued

working at Burroughs through the merger of Burroughs and Sperry to form Unisys in 1986.

(Zaber Tr. 11:19 – 13:11).

    98.     Mr. Zaber's employment with Unisys ended in November of 1990.  (Zaber

Tr. 12:8-11).

    b.     **Oral Communications About The Unisys PRM Plan**

    99.     Mr. Zaber interacted with Unisys Human Resource Representatives,

including Leslie Avery, when he was employed by Unisys.  (Zaber Tr. 42:11-24).

    100.     There were Human Resource Representatives located in the same facility

where Mr. Zaber worked during the last years of his employment with Unisys.  (Zaber Tr. 24:12

– 25:1).

    101.     Mr. Zaber claims that he attended a presentation that Leslie Avery gave to

a group of individuals interested in volunteering for retirement.  (Zaber Tr. 63:14-24).  Mr. Zaber

admitted that only general questions about retirement medical benefits were answered at this

presentation.  (Zaber Tr. 69:14-24).

    102.     Mr. Zaber claims that, during a meeting with Ms. Avery, he asked her if

his retirement medical benefits were locked in, and Ms. Avery responded affirmatively.  (Zaber

Tr. 80:18 – 82:4).  Mr. Zaber admits, however, that Ms. Avery told him that Unisys had the right

to make blanket increases to the contributions required for post-retirement medical benefits for

all retirees.  (Zaber Tr. 126:20 – 127:4).  Mr. Zaber made a notation of this statement by Ms.

Avery on a document that he produced to Unisys as part of this litigation, writing "locked in

except for blanket increase levied on all retirees." (Zaber Ex. 8, p. ZABER04282; Zaber Tr. 123:3-13).

103.    Mr. Zaber does not recall if he asked Ms. Avery if his retirement medical benefits could change.  (Zaber Tr. 82:5-14).

104.    Mr. Zaber admitted that he does not recall having any discussions about retirement medical benefits with anyone other than Ms. Avery.  (Zaber Tr. 129:1-23).

### c.    Written Communications About The Unisys PRM Plan

105.    During his employment with Unisys, Mr. Zaber received communications from Unisys that were delivered to his desk.  (Zaber Tr. 35:9-17).

106.    Mr. Zaber does not know whether or not he received the October 1987 communication from Unisys CEO W. Michael Blumenthal announcing the new Unisys flexible benefits program, but he was aware that Unisys was adopting a flexible benefits approach after the merger of Burroughs and Sperry to form Unisys in 1986.  (Zaber Tr. 27:21 – 28:3; 28:12 – 29:21).  While an employee at Unisys, Mr. Zaber understood that Unisys replaced the prior benefits programs of Burroughs and Sperry with a new Unisys benefits program.  (Zaber Tr. 31:4-9).

107.    Mr. Zaber does not recall whether or not he received the Flexible Benefits SPD, which contained numerous ROR clauses.  (Sichel Ex. 3; Zaber Tr. 135:23 – 136:12).

108.    Mr. Zaber received the February 1989 letter from J.A. Blaine to Employees Who Are Eligible to Retire with Post-Retirement Medical Benefits and the attachments thereto, including the Unisys PRM SPD.  (Zaber Tr. 33:2-22).  Mr. Zaber produced a copy of the letter and the attachments thereto with his responses to Unisys' 1999 discovery requests.  (Zaber Ex. 5; Zaber Tr. 33:2-22).  The copy of the letter and attachments produced by

31

Mr. Zaber contained handwritten notations that Mr. Zaber admitted that he made while still an employee at Unisys.  (Zaber Tr. 34:4-9).

109.    When Mr. Zaber read the February 1989 letter from J.A. Blaine, he understood that the plan design features for the Unisys PRM would be the same as those available to active Unisys employees under Unisys Medical Plan Option 2.  (Zaber Tr. 39:23 – 40:1).

110.    When Mr. Zaber read the Unisys PRM SPD attached to the February 1989 letter from J.A. Blaine, he understood that Unisys could not guarantee that his contribution levels for retiree medical coverage would remain the same throughout his retirement.  (Zaber Tr. 42:6 – 24).  Mr. Zaber claims, however, that Human Resources Representative Leslie Avery told him that, while changes might affect future retirees, by choosing to leave Unisys when he did, his retirement medical benefits would be "locked in" except for blanket increases levied on all retirees.  (Zaber Tr. 42:11-24; 125:22 – 127:11).

111.    In response to Unisys' 1999 discovery requests, Mr. Zaber also produced a packet describing the September 1989 VERIP.  (Zaber Ex. 5; Ex. 8; Zaber Tr. 112:8 – 113:1).  Mr. Zaber admitted that he was given this packet while he was a Unisys employee and that he read the packet when he received it.  (Zaber Tr. 113:1-10).  This packet contains clear and unambiguous reservation of rights language, which Mr. Zaber circled in his copy of the packet.  (Zaber Ex. 8, p. ZABER04282; Zaber Tr. 119:18 – 120:8).  Mr. Zaber admitted that he circled this language before he made the decision to end his employment with Unisys.  (Zaber Tr. 120:7-24).  Mr. Zaber admitted that, after reading the circled language, he understood that Unisys could not guarantee that the rate of his contributions to his retirement medical benefits would not rise.  (Zaber Tr. 121:9-14).  Mr. Zaber also made a notation on this page that stated his retiree medical

benefits were "locked in except for blanket increase levied on all retirees." (Zaber Ex. 8, p. ZABER04282; Zaber Tr. 123:3-13). Mr. Zaber claims this notation reflected a statement made to him by Leslie Avery. (Zaber Tr. 123:3-13).

112. In response to Unisys' 1999 discovery requests, Mr. Zaber also produced the Workforce Reduction packet given to all employees eligible for the voluntary layoff program Unisys conducted in 1990. (Zaber Ex. 3; Ex. 5; Zaber Tr. 57:6 – 58:19). This packet explicitly provided that post-retirement medical benefits for those employees who took voluntary layoffs would be provided pursuant to the Unisys PRM Plan. (Zaber Ex. 3, pp. 25-28).

113. After ending his employment with Unisys, Mr. Zaber received self-paid continuation of his healthcare coverage. (Zaber Tr. 98:22-24). Mr. Zaber testified that he is "pretty sure" he signed a COBRA form to enroll in that coverage. (Zaber Tr. 111:9-14). Mr. Zaber would have had to sign such a form to receive continuation coverage, and the COBRA form included reservation of rights language on the back. (See Sichel Ex. 23).

**F.** **Leonard Portzline**

    **a.** **Employment History**

114. Mr. Portzline began working for Burroughs in February of 1955 and continued working at Burroughs through the merger of Burroughs and Sperry to form Unisys in 1986. (Portzline Tr. 19:5-18).

115. Mr. Portzline understood that, after the merger of Burroughs and Sperry, Unisys started new Unisys benefits plans for its employees. (Portzline Tr. 36:21 – 37:8).

116. Mr. Portzline's employment with Unisys ended on July 23, 1991. (Portzline Tr. 13:17-19).

**b.      Written Communications About The Unisys PRM Plan**

117.     During his employment with Unisys, Mr. Portzline received communications from Unisys regarding his benefits in his mailbox at his branch office. (Portzline Tr. 40:11-20).

118.     Mr. Portzline admits that he never asked anyone for a copy of a document that summarized the benefits available to him as an employee.  (Portzline Tr. 46:13-17).

119.     Mr. Portzline recalls that in 1989, Unisys adopted a new Unisys PRM Plan.  (Portzline Tr. 48:4-7).

120.     Mr. Portzline admits that in February or March of 1989, he received the February 1989 letter from J.A. Blaine to Employees Who Are Eligible To Retire With Post-Retirement Medical Benefits and the attachments thereto, including the Unisys PRM SPD, in his mailbox at the branch office.  (Portzline Tr. 53:20 – 55:9).  Mr. Portzline produced a copy of this letter and its attachments with his responses to Unisys' 2004 discovery requests.  (Portzline Exs. 1-2).  This letter contained clear and unambiguous reservation of rights language.  (Portzline Ex. 1, Attachment 1 p. 3).  Mr. Portzline testified that he does not recall whether he read the letter or its attachments, but admits that Unisys would have no way of knowing that he did not read these documents.  (Portzline Tr. 56:3-6; 79:3-5; 86:17-23).  Mr. Portzline admitted that he never spoke to anyone about the letter or about Unisys' ability to change the contribution for his retirement medical coverage after he retired.  (Portzline Tr. 82:7-16).

121.     Mr. Portzline testified that, even if he had read the reservation of rights language contained in the Unisys PRM SPD attached to the February 1989 letter from J.A. Blaine, he would not have understood that Unisys reserved the right to change or terminate the Unisys PRM Plan.  (Portzline Tr. 84:9-18).

122.     Mr. Portzline testified that he could not recall specific documents that he received from Unisys informing him that medical costs were escalating dramatically, but he admitted that he "was aware that was happening." (Portzline Tr. 60:16-22).

123.     Mr. Portzline admitted that he was given the opportunity to participate in the September 1989 VERIP, and that he received material describing the terms of that program. (Portzline Tr. 102:24 – 103:7).  Mr. Portzline was eligible to participate in the September 1989 VERIP  based on his age and years of service.  (Sichel Ex. 6, p. 3; Portzline Tr. 19:5-18; 134:16-17).  The packet given to all employees eligible to participate in the September 1989 VERIP contained clear and unambiguous reservation of rights language.  (Sichel Ex. 6, p. 31).

124.     In response to Unisys' 2004 discovery requests, Mr. Portzline produced the Workforce Reduction packet given to all employees eligible for the voluntary layoff program Unisys conducted in 1990.  (Portzline Exs. 2, 5, 7; Portzline Tr. 116:22 – 117:12).  This packet explicitly provided that post-retirement medical benefits for those employees who took voluntary layoffs would be provided pursuant to the Unisys PRM Plan.  (Portzline Ex. 3, pp. 25-28).  Mr. Portzline ended his employment with Unisys by taking a voluntary layoff under the terms of this document.  (Portzline Tr. 91:7-10; 118:7-10).

125.     Mr. Portzline produced a signed COBRA form as an attachment to his responses to Unisys' 1999 discovery responses.  (Portzline Ex. 8; Portzline Tr. 119:22 – 120:6).  This COBRA form had reservation of rights language on the back.  (Sichel Ex. 23).  Mr. Portzline testified that he does not recall reading the reservation of rights language on the back of this form, but "apparently [he] did read it."  (Portzline Tr. 124:1-6).

c.     **Oral Communications About The Unisys PRM Plan**

126.     Mr. Portzline claims that throughout his employment with Burroughs and then Unisys, various branch managers and district managers told him and other employees that

they would have benefits for the rest of their lives.  (Portzline Tr. 71:19 – 73:1; 167:6-13; 168:20-24).  Mr. Portzline testified that he could not remember the specific words used during these meetings and conversations, but that the implication was that Burroughs – and later Unisys – employees would have benefits for the rest of their lives.  (Portzline Tr. 71:19 – 73:1; 167:14 – 168:1; 168:16-19; 169:1-169:5).

127.    Mr. Portzline admitted that he never asked any of the individuals whom he claims told him he would have benefits for life for any documents describing his retirement medical benefits.  (Portzline Tr. 73:10-14; 169:12-16).

128.    Mr. Portzline claims that in 1991, prior to the end of his employment with Unisys, he had two conversations with Archie Sybrandt, the branch manager to whom he reported, during which retirement medical benefits were discussed.  (Portzline Tr. 14:18-21; 144:18-21; 149:5 – 152:1; 157:1 – 158:9).  Mr. Portzline claims that the first meeting took place on April 30, 1991, and that the second meeting took place on May 2, 1991.  (Portzline Tr. 149:5-16; 157:1-7).

129.    Mr. Portzline admits that he cannot remember anything specific that Mr. Sybrandt said about retirement medical benefits during the April 30 meeting "except we all knew that we would be covered the rest of our life."  (Portzline Tr. 157:23 – 158:9).  Mr. Portzline admits that he does not remember Mr. Sybrandt specifically using the phrase "for the rest of your life."  (Portzline Tr. 158:5-9).

130.    In Mr. Portzline's responses to Unisys' 1999 discovery requests, Mr. Portzline's description of his conversation with Mr. Sybrandt did not include any mention of a statement by Mr. Sybrandt that Mr. Portzline would have retirement medical benefits for the rest of his life:

36

    c.     What did the individual say about retiree medical benefits?
Please indicate whether you are quoting directly or paraphrasing.

*    *    *

Paraphrase: Archie Sybrandt told me that my retiree medical
coverage would be affordable to my spouse and me.

(Portzline Ex. 14, pp. 4-5).  Mr. Portzline testified that he made every effort to provide complete

and accurate responses to Unisys' 1999 discovery requests.  (Portzline Tr. 154:24 – 156:1).

    131.    Mr. Portzline admits that "[t]he meeting on May 2nd was very brief" and

that there was no discussion of retirement medical benefits at that meeting.  (Portzline Tr. 152:5-

10).

    132.    Mr. Portzline also claims that he had a meeting with Human Resources

Representative Jean Jenco on July 22, 1991.  (Portzline Tr. 159:2-3).  Mr. Portzline admits that

he had already finalized his retirement at the time he met with Ms. Jenco.  (Portzline Tr. 159:6-

20).  Mr. Portzline further admits that Ms. Jenco told him "absolutely nothing" about his

retirement medical benefits, except to provide him with the current cost structure for those

benefits.  (Portzline Tr. 160:20-23).

## G.    <u>Leonard Sichel</u>

### a.    Employment History

    133.    Mr. Sichel began working for Burroughs in February of 1959 and

continued working at Burroughs through the merger of Burroughs and Sperry to form Unisys in

1986.  (Sichel Tr. 17:23 – 18:1; 26:8-14).

    134.    Mr. Sichel's employment with Unisys ended in June of 1991.  (Sichel Tr.

18:2-5).

### b.    Mr. Sichel's Understanding Of The Unisys PRM Plan

    135.    Mr. Sichel knew that when Burroughs and Sperry merged, Unisys

integrated the policies of Burroughs and Sperry to form Unisys policies.  (Sichel Tr. 117:12-15).

37

136.    Mr. Sichel understood that these new Unisys policies included medical benefits and retirement medical benefits, and he admitted that he "accepted them by continuing [his] employment."  (Sichel Tr. 118:1-19).

137.    Mr. Sichel understood that when he left Unisys in 1991, he left under the Unisys plan for retirement medical benefits and not the previously discontinued Burroughs or Sperry plans.  (Sichel Tr. 67:10-15).

138.    Mr. Sichel understood that Unisys was grappling with increased medical costs for employee benefits prior to his separation from Unisys.  (Sichel Tr. 58:1-5).

139.    Mr. Sichel understood that, while he was a Burroughs employee, Burroughs changed the benefit plan for retirees from year to year, and further understood that Burroughs had the right to make such changes.  (Sichel Tr. 110:22 – 111:13).

140.    Mr. Sichel understood that Burroughs could change the cost of his retirement medical benefits even after he retired, and that he "would have been surprised if there wasn't a change in cost as things changed, as new technology became available."  (Sichel Tr. 111:15 – 112:3).

141.    Mr. Sichel admitted that he continued to work at Burroughs despite his knowledge of Burroughs' right to make changes to the cost of retirement medical benefits from year to year.  (Sichel Tr. 114:17-19).

**c.    Oral Communications About The Unisys PRM Plan**

142.    Mr. Sichel interacted with Unisys Human Resource Representatives when he was employed by Unisys, including Jim Dodd and Marie Blount.  (Sichel Tr. 23:23 – 26:7).

143.    These Human Resource Representatives were located in the same building where Mr. Sichel worked during the last year of his employment with Unisys.  (Sichel Tr. 24:12-14).

38

144.    Mr. Sichel claims that, during a May 13 meeting about retirement with Jim Dodd, Mr. Dodd told him "that these are your benefits for life[.]"  (Sichel Tr. 169:11-23).

145.    Mr. Sichel never asked anyone at Unisys if the Company had the right, if it later decided to do so, to terminate the Unisys PRM Plan.  (Sichel Tr. 62:1 – 63:2; 122:12-15; 123:20 – 124:1).

146.    No one at Unisys ever told Mr. Sichel that the Unisys PRM Plan would not change or would not be terminated.  (Sichel Tr. 124:21 – 125:1).

147.    Mr. Sichel testified that his understanding that he would have retirement medical benefits for life was based not on oral or written communications from Unisys, but on:

> [A]n accumulation of information one absorbs over 32 years.  The company had always provided lifetime benefits to their retirees, with all the attributes that you can have, with the point system and how long you were there, your age.

(Sichel Tr. 108:19 – 109:1).

### d.    Written Communications About The Unisys PRM Plan

148.    During his employment with Unisys, Mr. Sichel received communications about his employee benefits from Unisys at his home through the mail.  (Sichel Tr. 31:7-13).

149.    Mr. Sichel did not have trouble receiving documents in the mail from Unisys and was not aware of any documents that were sent to him by Unisys that he did not receive.  (Sichel Tr. 32:10).

150.    Throughout his employment, Mr. Sichel received documents regarding retirement medical benefits from Unisys.  Mr. Sichel testified "I read and kept aware of whatever was going on with the medical benefits in the company.  Even though I may not remember specific documents, I was generally aware of what was going on with medical."  (Sichel Tr. 59:16-21).  Mr. Sichel added that he must have received documents describing his medical

benefits during his employment, and that while he "can't specifically remember this document or

that document, I do know that what – the content of them somehow got in my head."  (Sichel Tr.

60:5-11).  For example, Mr. Sichel does not remember one way or another if he received the

October 1987 letter from W. Michael Blumenthal enclosing information about the Unisys

Employee Benefits Program.  (Sichel Tr. 28:23 – 31:6).

      151.    Mr. Sichel testified that if he had read the reservation of rights language

contained in the Unisys Summary Plan Description Booklet, he "certainly" would have

understood that Unisys could terminate its medical plan.  (Sichel Ex. 3; Sichel Tr. 61:8-15; 63:3-

9).

      152.    Mr. Sichel admitted that, in November of 1991, he received a letter in the

mail from Corporate Benefits to "Individuals who have deferred participation in the Unisys PRM

Plan."  (Sichel Tr. 91:15-22; Sichel Ex. 16).

      153.    Mr. Sichel admitted that he read the November 1991 letter closely, and

that he read the entire letter, including the paragraph which stated:

> If you begin participation in the Unisys PRM Plan on or before
> December 31, 1991, Unisys will continue to subsidize a portion of
> the cost of coverage for you and your dependents once you or your
> covered dependents become eligible for Medicare (generally at age
> 65).

(Sichel Tr. 92:2-3; 93:16 – 94:8).

      154.    Mr. Sichel understood that the section in the November 1991 letter entitled

"Changes in the Cost of Coverage for Those Eligible for Medicare" was telling him "that the

PRM Plan was being changed."  (Sichel Tr. 103:23 – 104:2).

      155.    Mr. Sichel admitted that he must have read the paragraph in the November

1991 letter that stated "Unisys continues to reserve the right to modify or terminate this coverage

at any time, however."  (Sichel Tr. 105:11-20).  Mr. Sichel admitted that he understood that

Unisys "had the right to write this sentence" but that he had not "ever anticipated that my defined benefits package would not include retirement forever." (Sichel Tr. 107:20 – 108:2).

156.     Mr. Sichel testified that he must have discarded the attachments to the November 1991 letter, including the attachment that stated:

> Note: Although Unisys will attempt to maintain your contributions at the level in effect during the year in which your participation begins, the company cannot guarantee that contribution levels will remain unchanged in the future. Unisys reserves the right to increase contribution levels at any time.

(Sichel Tr. 129:15 – 130:1; 135:19 – 22). Mr. Sichel admitted that this language reflected that Unisys had the right to increase retiree contribution levels at any time. (Sichel Tr. 137:1-5).

157.     Mr. Sichel subsequently testified that he did not know one way or the other if the attachments to the November 1991 letter were included with the copy of the letter that was mailed to him. (Sichel Tr. 136:5-8).

158.     Mr. Sichel signed a COBRA form which included reservation of rights language on the back. (Sichel Exs. 22-23, Sichel Tr. 163:9-11; 166:6-18).

159.     Although Mr. Sichel now claims that he did not read the reservation of rights language on the COBRA form, Mr. Sichel admitted that Unisys would have had no reason to know that he did not read the reservation of rights language on the COBRA form when he signed it. Above Mr. Sichel's signature, the COBRA form states "I have read and understand the statement on the reverse side of this form." (Sichel Ex. 22, Sichel Tr. 165:8-16; 166:1-5).

### e.     Mr. Sichel's Separation From Employment With Unisys

160.     A few weeks prior to May 13, 1991, Mr. Sichel testified that he was contacted by Human Resources Representative Paul Dodd about negotiating an agreement whereby Mr. Sichel's employment with Unisys would be terminated. (Sichel Tr. 146:3-18).

161.    On May 13, 1991, Mr. Sichel met with Mr. Dodd, and Mr. Dodd presented Mr. Sichel with an agreement (the "Agreement and Release") regarding Mr. Sichel's future employment status with Unisys.  (Sichel Ex. 18; Sichel Tr. 149:17-18; 170:3-5).

162.    Mr. Sichel admitted that the Agreement and Release "summarized all the – all aspects of my agreement – all of my decision to leave."  (Sichel Tr. 145:24 – 146:2).  Mr. Sichel further admitted that he reviewed each provision in the Agreement and Release during his meeting with Mr. Dodd on May 13, 1991.  (Sichel Tr. 154:15-21).

163.    Mr. Sichel signed the Agreement and Release on May 15, 1991.  (Sichel Tr. 151:16-18).

164.    The Agreement and Release contains an integration clause that states:

> This Agreement and Release constitutes the entire agreement between you and Unisys.  There are no oral or written agreements or understandings that vary from the terms set forth herein.

(Sichel Ex. 18, ¶ 7).

165.    Mr. Sichel admitted that he read the integration clause and reviewed it with Mr. Dodd during the meeting on May 13, 1991, before he signed the Agreement and Release.  (Sichel Tr. 151:2-5).

166.    The Agreement and Release does not guarantee that retirement medical benefits will be provided for life.  (Sichel Ex. 18; Sichel Tr.  172:5-9).  The only mention of medical benefits in the Agreement and Release is a provision that states:

> Coincident with a layoff, your vacation pay, medical benefit coverage and conversion privileges will be provided pursuant to applicable Unisys policy.

(Sichel Ex. 18, ¶ 2).

167.    Mr. Sichel understood that, pursuant to the provision quoted in ¶ 33, his retirement medical benefits would be pursuant to the Unisys PRM Plan.  (Sichel Tr. 149:2 – 150:2).

168.    The Agreement and Release provided that Mr. Sichel would be involuntarily terminated as a result of signing the Agreement and Release.  (Sichel Tr. 194:10-14).

169.    The Agreement and Release provided that Mr. Sichel would receive $84,856.27 in notice pay, income assistance, accrued and unused vacation, and outplacement cost in return for signing the Agreement and Release.  (Sichel Ex. 18, ¶ 3).

170.    In accordance with the terms of the Agreement and Release, Mr. Sichel's employment with Unisys ended in June of 1991.  (Sichel Ex. 18, ¶1; Ex. 28, p. 4).

171.    Mr. Sichel collected unemployment benefits after his employment with Unisys ended.  (Sichel Tr. 192:16-18).

172.    Mr. Sichel now claims that after receiving the Agreement and Release, but before signing it, he received two documents regarding retirement medical benefits from Human Resources Representative Marie Blount.  (Sichel Tr. 158:2 – 159:19).

173.    Neither of the documents that Mr. Sichel claims he received from Ms. Blount state that the costs or benefits of the Unisys PRM Plan could not change.  (Sichel Exs. 20-21; Sichel Tr. 181:8 – 182:7; 183:7 – 184:1).

174.    Mr. Sichel admits that he did not ask Ms. Blount if the costs of his medical benefits could change before he signed the Agreement and Release. (Sichel Tr. 181:5-7).

43

175.     Mr. Sichel admits that he did not ask Mr. Dodd if the costs of his medical

benefits could change before he signed the agreement and release.  (Sichel Tr. 180:7-9).

### f.     Mr. Sichel Did Not Rely To His Detriment Upon His Alleged Misunderstanding About The Unisys PRM Plan

176.     In his 2004 Interrogatory Responses, Mr. Sichel claimed that if he had

been aware that Unisys had the right to shift the cost for retirement medical benefits to retirees or

to terminate such benefits altogether, he: 1) would not have stopped working for Unisys; 2)

would have started his pension at a later date; 3) would have looked for employment that offered

retirement medical benefits; and 4) would have avoided certain discretionary expenditures.

(Sichel Ex. 28, p. 7).

177.     On direct examination during his deposition, however, Mr. Sichel

repeatedly admitted that he did not know if he would have acted any differently if he had known

that Unisys had the right to terminate retirement medical benefits, but also that he did not know

whether or not they would exercise that right.  (Sichel Tr. 202:17-20; 205:6-7; 208:2-5; 208:22 –

209:2; 209:16-18).

178.     On direct examination during his deposition, Mr. Sichel demonstrated his

understanding of the distinction between knowledge that Unisys *was going to terminate*

retirement medical benefits, and knowledge that Unisys *had the right to terminate* retirement

medical benefits.  When asked if he would have stopped working at Unisys when he did if he

had known only that Unisys had the right to terminate retirement medical benefits, Mr. Sichel

answered that he did not know:

> Q.     Do you contend that you would not have stopped working
> at Unisys if you had known that Unisys had the right to modify or
> terminate the retiree medical benefits?
>
> A.     If I knew that I was not going to have – I was going to have
> to pay for my medical, not the terminate part of your question, but

the cost part of your question, I would not have quit. I would have not agreed to that. I would have kept working. Because I couldn't afford it.

Q.      So if you knew that Unisys was going to raise the costs, you would have kept working, correct?

A.      Right.

Q.      What if you knew they had that right, but you didn't know if they were going to exercise it?

A.      I don't know.

(Sichel Tr. 202:1-20).

179.    In connection with his claim that he would have started his pension at a later date, Mr. Sichel once again testified that he did not know if he would have done anything differently if he had known only that Unisys had the right to terminate retirement medical benefits:

Q.      First of all, are you testifying here today that you would not have started your pension if you knew that Unisys had the right, although not necessarily that it would, to change the cost of your retiree medical benefits or to terminate that program?

A.      I knew they had the right – I don't know what I would have done there.

Q.      Okay. Now are you testifying that if you knew that the costs were going to change –

A.      If I knew the costs were going to go up, I would have started later.

(Sichel Tr. 204:23 – 205:7).

180.    Mr. Sichel's testimony regarding his claim that he would have sought other employment with retirement medical benefits unequivocally demonstrates his understanding of the difference between knowledge that Unisys would terminate retirement medical benefits, and knowledge that Unisys had the right to terminate those benefits. Once

again, Mr. Sichel testified that if he had known only that Unisys had the right to terminate such

benefits, he did not know if he would have done anything differently:

> Q.     Are you testifying that you would have looked for other
> employment that offered retiree medical benefits if you knew that
> Unisys had the right, but not necessarily that it would, to change
> the cost of your retiree benefits or terminate that plan.
>
> A.     I never looked at any of these decisions in the view that
> Unisys had the right to do something.  It was a matter of if they
> did, not the right to.
>
> *     *     *
>
> Q.     But if you knew they had the right, but not necessarily that
> they would –
>
> A.     If I knew they had the right, I'm not sure what I would have
> done.

(Sichel Tr. 207:19 – 209:2).

181.     In Mr. Sichel's testimony regarding his claim that he would have avoided

certain discretionary expenditures, Mr. Sichel admitted that he probably would not have done

anything differently if he had known only that Unisys had the right to terminate retirement

medical benefits:

> Q.     Is that also true about avoiding certain discretionary
> expenditures, that if you knew they had the right –
>
> A.     I was – for example, in 1991, I was running a condominium
> at the shore year-round for 15 grand.  Expenses like that and the
> expenses associated with that I would have not had if I knew the
> pension benefits were going to cost what they cost now.
>
> Q.     And so my same question is, what if you knew only that
> they had the right to change the plan, but not –
>
> A.     I probably would never – I don't know, but I doubt if I – I
> would have done anything because they had the right.

(Sichel Tr. 209:3-18).

182.     When questioned by his own attorney, Mr. Sichel gave testimony

regarding his detrimental reliance allegations that could be construed as inconsistent with the

testimony quoted in ¶¶ 178-181.  On re-direct examination, however, Mr. Sichel testified

unequivocally that he would not have done anything differently if he had known only that Unisys

had the right to terminate retirement medical benefits.  (Sichel Tr. 233:6-11; 233:17-18).

183.    When Mr. Sichel was asked on redirect if he would have ended his

employment with Unisys when he did "even if [he] knew that the Company had the right to

change the cost of [his] medical benefits[,]" Mr. Sichel twice responded "Yes."  (Sichel Tr.

233:6-11; 233:17-18).

184.    When Mr. Sichel was asked on redirect whether he would have acted

differently if, at the time of his separation from Unisys, he had known that Unisys had the right

to terminate or change the retiree medical benefit plan, he answered with an unequivocal "No."

(Sichel Tr. 239:17 – 240:4).

## H.    **Floyd Ross**

### a.    **Employment History**

185.    Mr. Ross began working for Univac in October of 1959, continued

working for Univac through the transition from Univac into Sperry, and then continued working

for Sperry through the merger of Sperry and Burroughs to form Unisys in 1986.  (Ross Tr. 15:10

– 16:14).

186.    Mr. Ross worked within a division of Unisys known as Timeplex.  The

Timeplex division was sold to Ascom, a Swiss company, in 1991.  Mr. Ross ceased being a

Unisys employee as a result of the sale of Timeplex, but continued to work for Timeplex and its

successors until 1997.  (Ross Tr. 17:21 – 18:21).  Mr. Ross was not given a choice to remain at

Unisys after the sale of the Timeplex division.  (Ross Tr. 93:13-21).

187.     Mr. Ross enrolled in the Unisys PRM Plan on September 30, 1991, after the sale of the Timeplex division.  (Ross Ex. 2, Ross Tr. 111:18 – 114:9).  Mr. Ross remained a participant in the plan until 1997.  (Ross Tr. 138:6-9).

### b.     Mr. Ross Did Not Rely To His Detriment Upon His Alleged Misunderstanding About The Unisys PRM Plan

188.     In his 2004 Interrogatory Responses, Mr. Ross claimed that if he had been aware that Unisys had the right to shift the cost for retirement medical benefits to retirees or to terminate such benefits altogether, he: 1) "would have gotten other insurance earlier";  and 2) would have left Unisys to take another job offer on December 4, 1986.  (Ross Ex. 5, pp. 7-8).

189.     As to his claim that he "would have gotten other insurance earlier", Mr. Ross admitted in his deposition that, despite becoming aware that Unisys planned to increase the cost of retirement medical benefits in 1993, Mr. Ross did not actually seek other insurance *until 1997* because he "didn't think of it."  (Ross Tr. 140:20 – 142:4).  Further, Mr. Ross admitted that he would only have cancelled his Unisys insurance and taken other insurance earlier if he found less expensive insurance on the open market, testifying that "[a]s long as the Unisys plan was less than that the other one was going to be, then I'd stay there."  (Ross Tr. 143:23 – 144:9).  Yet as late as 1993, after Unisys had already announced it would be increasing the costs of retirement medical benefits, Mr. Ross was paying only $50 per month for his retirement medical benefits – a price that he admitted he could not have beaten on the open market:  "I'm sure that you couldn't beat $50 a month."  (Ross Tr. 145:3-11).

190.     As to his claim that he would have left Unisys to take another job offer on December 4, 1986, Mr. Ross admitted that he was not eligible for retirement medical benefits on that date, and that it was possible he would never have become eligible for such benefits:

> Q.     In 1986 you weren't eligible to retire and receive retiree medical benefits from Unisys; is that correct?

> A.      No, no.
>
> Q.      And your employment could have been terminated before you reached age 55, couldn't it?
>
> A.      I didn't think that was going to happen because I thought I was well-respected in the industry and in the company, but I suppose it could have, yes.

(Ross Tr. 72:13-23).  Mr. Ross further admitted that he "might have well" accepted the other job offer, but "can't be certain" he would have done so even if he had been told in 1986 that Unisys had the right to terminate or change the retirement medical benefits to which he was not yet entitled.  (Ross Tr. 80:13 – 81:1).

191.    At his deposition, Mr. Ross for the first time claimed that, if he had known Unisys had the right to terminate or change his retirement medical benefits, he would have tried to stay with Unisys when Timeplex was sold by finding another position at Unisys.  (Ross 133:5-16).  Mr. Ross made no mention of this claim in his 2004 discovery responses, which he declared under penalty of perjury were true and correct.  (Ross Ex. 5, p. 14).

192.    Mr. Ross' belief that he may have been able to find alternative employment at Unisys after the sale of Timeplex is based on unsupported speculation.  In fact, Mr. Ross admitted multiple times that he was not given a choice to continue employment with Unisys, and that he was not offered any other positions with Unisys after Timeplex was sold.  (Ross Tr. 93:13-21; 98:22 – 100:3).  Mr. Ross further admitted that he did not even think of the

possibility of trying to remain at Unisys after the sale of the Timeplex division until after he

submitted his responses to Unisys' 2004 discovery requests in 2005.  (Ross Tr. 136:19 – 137:1).

Respectfully submitted,

/s/ Joseph J. Costello
JOSEPH J. COSTELLO (No. 44327)
PAUL C. EVANS (No. 84535)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103


JOSEPH A. TEKLITS (No. 51831)
Unisys Corporation
Unisys Way
MS E8-114
Blue Bell, Pennsylvania 19424

Attorneys for Defendant Unisys Corporation